## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

D.R. HORTON, INC.,
a Delaware corporation,

       Plaintiff,

vs.                                                                    CIV-07-709 MV/RHS

CURB NORTH, INC., a New Mexico
corporation, and the CITY OF RIO
RANCHO, a New Mexico municipality,

       Defendants.

### MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on Plaintiff's Petition and Motion for Writ of

Mandamus and/or Temporary Restraining Order and Preliminary Injunction, filed

September 21, 2007, **[Doc. No. 23]**.  A hearing was held on this motion on October 11, 2007,

and, at the conclusion of the hearing, the motion was denied orally.  This Opinion sets forth in

more detail the bases of the Court's October 11, 2007 oral ruling.

### BACKGROUND

This dispute arises out of the calculation of impact fees[1] due to Defendant City of Rio

Rancho ("City") from the development of a residential subdivision known as the Cabezon

Communities by Defendant Curb North, Inc. ("Curb North").  A brief overview of the relevant

statutory background is necessary to provide context for the dispute.

---

[1] An "impact fee" is a "charge or assessment imposed by a municipality or county on new development in order to generate revenue for funding or recouping the costs of capital improvements or facility expansions necessitated by and attributable to the new development."  § 5-8-2(I) NMSA 1978.

## I.      Statutory Background

### A.  Zoning Statutes and Code

By statute, the State of New Mexico has granted municipalities and counties zoning

authority to regulate the "(1) height, number of stories and size of buildings and other structures;

(2) percentage of a lot that may be occupied; (3) size of yards, courts and other open space; (4)

density of population; and (5) location and use of building, structures and land for trade,

industry, residence or other purposes."  *See* § 3-21-1, *et seq*., NMSA 1978 (hereinafter "the

Zoning Act").  Section 3-21-8(B) of the Zoning Act provides, in pertinent part, that any person

aggrieved by a zoning decision may file an appeal and that the filing of such an appeal will stay

all proceedings in furtherance of the action appealed.[2]  *Id*. at § 3-21-8(B).  In accordance with the

grant of zoning authority in the Zoning Act, the City enacted zoning provisions as part of its City

Code. *See* City Code § 150.01, *et seq.*  Consistent with § 3-21-8(B) of the Zoning Act, City Code

§ 150.08 provides for an appeal of zoning decisions and states that such an appeal will stay the

---

[2]  Section 3-21-8(B) states:

Any aggrieved person or any officer, department, board or bureau of the zoning
authority affected by a decision of an administrative officer, commission or
committee in the enforcement of Sections 3-21-1 through 3- 21-14 NMSA 1978
or ordinance, resolution, rule or regulation adopted pursuant to these sections may
appeal to the zoning authority. An appeal shall stay all proceedings in furtherance
of the action appealed unless the officer, commission or committee from whom
the appeal is taken certifies that by reason of facts stated in the certificate, a stay
would cause imminent peril of life or property. Upon certification, the
proceedings shall not be stayed except by order of district court after notice to the
official, commission or committee from whom the appeal is taken and on due
cause shown.

§ 3-21-8(B), NMSA 1978.

2

challenged decision.[3]

### B.  New Mexico Development Fees Act

The State of New Mexico also has enacted legislation granting counties and

municipalities the authority to enact or impose impact fees related to a development.  *See* New

Mexico Development Fees Act, § 5-8-1, *et seq*., NMSA 1978 (hereinafter "the Development

_____

[3] City Code § 150.08 states:

    (A)(1)    Appeal of any action or decision by the City Development
Department may be filed with the Planning and Zoning Board within 30 days
after the date of the determination by the City Development Department.

    (2)    Appeal of any action or decision by the Planning and Zoning Board
may be filed with the governing body within 30 days after the date of the
determination by the Board.

    (B)(1)    The Planning and Zoning Board shall give public notice of the time
and place of hearing of the appeal and written notice to the appellant, City
Development Department, and a representative of the opponents, if any, at least
15 days before the date of the hearing.  The appeal must be presented within three
months after the date of filing.

    (2)    The governing body shall give public notice of the time and place of
hearing of the appeal and written notice to the appellant, members of the Board
and a representative of the opponents, if any, at least 15 days before the date of
the hearing.  The appeal must be presented within three months after the date of
filing.

    (C)    An appeal shall stay all proceedings in furtherance of the action
appealed unless the City Development Department or Board from whom the
appeal is taken certifies that, by reason of facts stated in the certificate, a stay
would cause imminent peril of life or property.  Upon certification, the
proceedings shall not be stayed except by order of the district court after notice to
the City Development Department or the Board from whom the appeal was taken
and on due cause shown.

City Code § 150.08.

Fees Act"). The Development Fees Act establishes what types of costs may be imposed via an impact fee, sets forth the time for assessing and collecting impact fees, and requires impact fees to be deposited in a separate interest-bearing account to be used only for the capital improvements for which the fees were imposed. The Development Fees Act also permits cities to grant credits against impact fees to developers who contribute improvements or land in excess of that required for development approval. *Id.* at § 5-8-15.

The City codified its authority under the Development Fees Act at §§ 150.2-150.99 of the City Code. While the Development Fees Act did not specifically address appeals, the City included an appeal provision for impact fee disputes in the City Code. City Code § 150.33 provides that:

> (B)(1) An appeal from the provisions of this subchapter shall be submitted to the Impact Fees Administrator or his designees within 30 days from the event giving rise to the right to an appeal. The notice of appeal shall be accompanied by payment of a non refundable processing fee.
>
> (2) If the notice of appeal is accompanied by a bond or other sufficient surety satisfactory to the City Attorney in an amount equal to the impact fee assessed, the Chief Building Official or his duly designated agent shall issue the building permit.
>
> (3) The filing of an appeal shall not stay the collection of the impact fee unless a bond or other sufficient surety has been filed.
>
> (4) Appeals shall be considered by the Planning and Zoning Board within 30 days of the filing of the notice of appeal. The decision of the Planning and Zoning Board may be appealed to the governing body within 30 days of the decision. The decision of the governing body shall be considered final.

City Code § 150.33(B)(1).

## II. Factual Background

### A. Impact Fee Ordinance Development Agreement for the Cabezon Communities

4

In 2003, Curb North and the City entered into an agreement known as the "Impact Fee Ordinance Development Agreement for the Cabezon Communities" (hereinafter "Development Agreement").  The Development Agreement states that it is a "hybrid of an In Lieu Agreement and a Credit Agreement providing that the Developer shall construct, dedicate land, and/or pay money for System Improvements in lieu of Impact Fees for the Property, and the Developer shall be entitled to Impact Fee Credits for the value of such System Improvements in excess of the 'in lieu' obligations for the Property."  The amount of impact fee credits earned "are equal to the amount by which the valuation of the System Improvements . . . exceed the impact fees for development within the Project pursuant to the impact fees which would be due based upon the impact fee rates being charged at the time of the valuation of the System Improvements." Development Agreement at ¶ 4.

The Development Agreement provides that Curb North has the responsibility to collect the appropriate amount of impact fees from third parties to whom Curb North sells land within the Cabezon Communities to fund the System Improvements provided by Curb North.  *Id*. at ¶ 5(G).  The impact fees are deposited in an escrow account at the closing of each purchase and withdrawn as needed by Curb North to fund the System Improvements.  The Development Agreement also requires Curb North to identify to the City the purchasers who have closed the purchase of property in the Cabezon Communities and who have paid monies into the impact fee escrow accounts so that "the City can reflect, on its records, those purchasers, by name of purchaser and lot and block for which impact fees have been paid and collected, exempt from paying such impact fees to the City when such purchasers apply for building permits for the lots within the Project for which such payments were made." *Id.*

The Development Agreement states that "the current estimated impact fees assessed to the Property are as listed on Exhibit "B" attached hereto and incorporated herein by reference." *Id*. at ¶ 3. Exhibit B provides that the estimated impact fee for a single family residence in the Cabezon Communities is $5,920.00. *Id*. at Ex. B.

Under the Development Agreement, if, when the property is fully developed, the value of the System Improvements that Curb North has constructed in lieu of paying impact fees is greater than the value of impact fees assessed, Curb North obtains credits for the difference between the two. These credits can be used by Curb North on future projects within the City or Curb North can sell the credits to another developer to use on a future project with the City.

**B. Impact Fee Schedule**

At the time the Development Agreement was negotiated in 2003, impact fees were $5,920.00 per single family residential home. In November of 2005, the City issued a new impact fee schedule (hereinafter "November 2005 Impact Fee Schedule") that increased impact fees to $7,699.00 effective May 1, 2007, and to $8,890.00 effective January 1, 2007.

**C. Purchase and Sale Agreements**

Curb North sold three tracts of land in the Cabezon Communities–Cabezon 15A, Cabezon 10A-1, and Cabezon 8A (now known as Astante Townhomes, Toscana, and Las Brisas, respectively)--to Plaintiff D.R. Horton, Inc. ("Horton"), for the purpose of constructing and selling residential housing. For each of these transactions, Curb North and Horton entered into a sale and purchase agreement.          .

**i. Purchase Agreement for Tract 15A**

The sale and purchase agreement for Tract 15A, which was executed on July 15, 2005,

provides that Horton will pay impact fees for its development of Tract 15-A but does not provide for any increase in the impact fees after the amount collected at closing is placed into escrow. The escrow agreement for Tract 15A provides that the impact fee deposit is calculated at $5,920.00 per single family residential home.  Accordingly, at closing, Horton deposited $5,920.00 per single family residential home into the impact fee escrow account.

### ii.  Purchase Agreement for Tract 10A-1

The sale and purchase agreement for Tract 10A-1 was signed by Curb North in August 2005 and by Horton in September 2005--prior to either party being aware of the City's intent to amend its impact fee ordinance to increase impact fees.  Prior to the closing date, however, Curb North met with Horton and another builder to discuss the proposed increases in impact fees.  At this meeting, Curb North asserts that both builders were asked to deposit, at closing, their respective impact fees based on the new impact fee level.  Horton negotiated to pay $5,920.00 per home at closing with the remainder due a week prior to pulling a building permit. Accordingly, the escrow agreement entered by Horton and Curb North for Tract 10A-1 calculates the impact fee deposit due at closing as $5,920.00 per single family home with additional payments in the future:

> [Horton] agrees to provide [Curb North] and the Escrow Agent, at least fifteen (15) days prior to applying to the City of Rio Ranch for building permit(s) for home to be constructed on the Lots, with written notice identifying the Lots, by block and lot number and street address, and to deposit with the Escrow Agent, simultaneously with the delivery of such list, as a supplement to the Impact Fee Deposit to be held and disbursed pursuant to this Agreement, the sum of $1,799.00 per Lot for Lots for which [Horton] applies for and receives building permits from May 1, 2006, through December 31, 2006, inclusive, and the sum of $2,970.00 per Lot for Lots for which [Horton] applies for and receives building permits on or after January 1, 2007.

> [Horton] further agrees that for each of the Lots which it has not applied and

received building permits for by February, 2009, to deposit, as a supplement to the Impact Fee Deposit to be held and disbursed pursuant to this Agreement, the difference between the amount of impact fees for roads, bikeways, parks, trails, water, and waste water impact fees that the City of Rio Ranch has determined to be due with respect to such Lots, assuming building permits are issued as of February 1, 2009, and the sum of $5,920 deposited per each such Lot pursuant to this Agreement.

¶ 4, Tract 10A-1 Impact Fee Escrow Agreement, Ex. C to Curb North's Answer and

Counterclaim.

### iii.  Purchase Agreement for Tract 8A

On November 10, 2005, counsel for Curb North sent counsel for Horton an email with

comments on the draft purchase agreement for Cabezon Tract 8A that stated, in part, that "if,

during [Horton's] development of the property (when it goes to building permit) the City's new

ordinance on higher impact fees kicks in (May of 2006), [Horton] to pay the increase in the

impact fee per unit to [Curb North] . . . ."  Horton, apparently anticipating that development

would not start until after the date the first increase in phased impact fees occurred,  requested

that Curb North cover a portion of the increase in impact fees for Tract 8A.  Curb North agreed

to do so and Section V.C of the purchase and sale agreement on Tract 8A, which was executed in

January of 2006, states, in pertinent part, that:

At Closing, [Curb North] shall fund an Impact Fee Holdback to be held by the title Company . . . in the amount of $161,500.  This hold back shall be used to fund the impact fees required to be paid by the City in excess of $5,920 per single family residential lot having a 5/8ths inch water meter (excluding Public Safety Impact Fees) for Purchaser to pull building permits for single family residential lots within the tract on or after May 1, 2006.  The planned increase to the single family residential lot impact fees for single family residential lots having 5/8ths inch water meters, within the Tract, excluding public safety impact fees, as of May 1, 2006, is $1994 per residential lot.  This hold back shall be used to fund to [Curb North] the impact fees required to be paid by [Horton} pursuant to this Section V.C. in excess of $5,920 per single family residential lot, 5/8ths inch water meter, excluding public safety fees, for 81 single family residential lots

8

within the Tract.  If a balance remains in the Impact Fee Holdback Account after [Horton] has obtained building permits for 81 single family residential lots within the Tract, said balance shall be released from the Impact Fee Holdback Account and disbursed to Seller.  If the excess impact fees (that amount over $5,920 per lot, excluding public safety impact fees, for lots with 5/8ths inch water meters) to be paid by [Horton] with respect to single family residential lots to be developed within the Tract exceed $161,500, [Horton] shall be responsible for such excess payment and shall make such in accordance with the terms of this Section V.C.

Tract 8A Purchase Agreement, Ex. 4 to Complaint.

Per the purchase and sale agreement, at closing Curb North deposited $161,500.00 ($1,994.00 x 81) in the escrow account and Horton deposited $479,250.00 ($5,920.00 x 81).  The escrow agreement stated that Horton's impact fee deposit, Curb North's impact fee deposit, "and further deposits of impact fees made by [Horton] pursuant to Section V.C. of the Contract" would be deposited with the escrow agent.

Horton acknowledges that the escrow agreement recognizes that the City had announced the increase of impact fees and that there could be an assessment by the City in excess of the $5,920.00 per lot but argues that the Development Agreement exempted properties in the Cabezon Communities from impact fee increases so no increases could lawfully be applied to properties in the Cabezon Communities.

Between November 16, 2006, and August 2, 2007, the City issued Horton approximately 167 building permits for properties in the Cabezon Communities.  Approximately 60% of these home are completed and occupied by the owners.

**E.  The Dispute**

In late 2006 or early 2007, Curb North asserted that under the three purchase agreements, Horton was required to pay the impact fees in effect at the time Horton was issued building permits and not the $5,920.00 in effect at the time the Development Agreement was signed.

Accordingly, Curb North requested that Horton deposit additional amounts in the escrow accounts for impact fees.  Horton refused to do so on the grounds that it was a third party beneficiary to the Development Agreement; that the impact fee was set at $5,920.00 in the Development Agreement; and that this amount could not be increased by the City for at least four years from the date of the Development Agreement.

At some point, Curb North contacted the City to get its position on what impact fees were due under the Development Agreement.  In a letter to Curb North dated July 2, 2007, the City stated that under the Development Agreement, Horton was obligated to pay the phased impact fees set forth in the November 2005 impact fee schedule based on the date of issuance of each applicable building permit.[4]  The City requested that Curb North relay this information to Horton and to advise the City within thirty days if Horton had fully paid the impact fees due into the impact fee escrow accounts.  If the full impact fees were not paid within thirty days, the City said it would consider revoking building permits issued to Horton or withhold issuing further building permits  to Horton.

On July 24, 2007, Horton filed a Complaint in this Court seeking a declaratory judgment regarding the proper calculation of impact fees for single-family residential units in the Cabezon Communities and injunctive relief prohibiting the City from revoking building permits and from applying the November 2005 Impact Fee Schedule to the Cabezon Communities.

On July 31, 2007, Horton filed an appeal with the City, contesting the interpretation the

---

[4]  The City and Curb North assert that the Development Agreement was not an "agreement for payment of impact fees" pursuant to § 5-8-9 but was only intended to 1) memorialize the system improvements that Curb North would construct for the City; 2) establish a process for Cub North's collection of impact fees from third parties to whom it sold land within the Cabezon Communities; and 3) establish how impact fees credits would be calculated.

City had taken in its July 2, 2007 letter to Curb North that the November 2005 Impact Fee

Schedule applied to all building permits issued to Horton for construction in the Cabezon

Communities.  Horton requested a stay of the City's decision pending appeal pursuant to City

Code § 150.08(C) and § 3-21-8(B) NMSA 1978.

On August 31, 2007, the City, through its outside counsel, sent a letter to Horton stating

that Horton's appeal of the determination rendered to Curb North in the July 2, 2007 letter had

been rejected because the "matter determined in [the City's] July 2, 2007, letter was raised solely

by Curb North and relates to compliance with the Impact Fee Ordinance Development

Agreement (Agreement) entered into between the City and Curb North" and that "Horton is not a

party to that Agreement."[5]  The letter went on to state that at the time the July 2, 2007 letter was

sent, the City did not know whether Horton was in compliance with the impact fee requirements

but that Curb North subsequently had confirmed that Horton had failed to place sufficient impact

fee monies into escrow and, therefore, the City would not issue any new building permits to

Horton for its properties in the Cabezon Communities.  The letter informed Horton that this was

a final decision that could be appealed within thirty days under the provisions of City Code §

150.2 and § 150.33(B) but that the filing of an appeal would not stay the decision "unless a bond

or other surety in the amount of the deficiency owed under the Phased Impact Fee Schedule for

the remaining lots is deposited with the City."  The City indicated that Curb North had calculated

_____

[5]  Horton alleges that the rejection of its appeal was improper because it was made
without due process, was conveyed by the City's outside counsel with no indication that the
decision was made by the Planning and Zoning Board, and was contrary to state statute and
municipal ordinances requiring appeals to be heard by the Planning and Zoning Board.  Despite
several requests from Horton, the City has not indicated who made the decision to void Horton's
first appeal.

the deficiency for past and future permits as $1,446,599.00.[6]

Horton appealed this determination on September 21, 2007. Horton characterized its September 21, 2007 appeal as a continuation of the dispute raised in its July 31, 2007 appeal and requested that the two appeals be consolidated. Horton ignored the City's position that the appeal of an impact fee must be made pursuant to City Code §§ 150.2 and 150.33(B) and requested a stay pursuant to City Code § 150.08(C) and § 3-21-8(B) NMSA 1978. At the same time, Horton filed the instant motion seeking a writ of mandamus requiring the City to hear its first appeal and to stay its decision pending the hearing of Horton's two appeals or a temporary restraining order and preliminary injunction requiring the City to continue issuing building permits without the payment of additional impact fees during the pendency of Horton's appeal.

Horton's primary contention is that application of the November 2005 Impact Fee Schedule rather than the Development Agreement constitutes a breach of contract as well as a denial of Horton's constitutional rights. Following the filing of Horton's motion, the City agreed to hear Horton's first appeal in conjunction with Horton's second appeal.

## <u>ANALYSIS</u>

### I.      **Writ of Mandamus**

Horton seeks a writ of mandamus requiring the City to adhere to state statute and City Code in processing Horton's administrative appeals. Specifically, Horton seeks to require the City to provide Horton with a hearing on Horton's first administrative appeal and to require the

---

[6] This amount includes impact fees for future building permits Horton may obtain. Curb North contends that Horton's repudiation of its contract obligation to pay the impact fee increases gives Curb North grounds for asking this Court to require immediate payment of future impact fees. Horton contests whether Curb North can accelerate payment of impact fees. Approximately $529,989 of this amount is for permits that already have been issued.

City to stay its decision to withhold the issuance of building permits pending resolution of

Horton's first and second administrative appeals.

### A.  Standard for Obtaining a Writ

"'Mandamus is a drastic remedy to be invoked only in extraordinary circumstances.' "

*State ex rel. Shell W. E & P, Inc. v. Chavez*, 2002-NMCA-005, ¶ 8, 131 N.M. 445, 38 P.3d 886

(quoting *Brantley Farms v. Carlsbad Irrigation Dist.*, 1998-NMCA-023, ¶ 12, 124 N.M. 698,

954 P.2d 763).[7]   Under New Mexico law, a writ of mandamus "is appropriate to compel the

---

[7] New Mexico law establishes a specific process for requesting a writ of mandamus.  A mandamus action is initiated by the filing of a verified application or petition for writ of mandamus. *See Brantley Farms*, 1998-NMCA-023, ¶ 12 ("The party seeking a writ must first file an application or petition.").  The court may issue either an "alternative" writ or a "peremptory" writ. § 44-2-6 NMSA 1978 ("The writ is either alternative or peremptory.").  An alternative writ directs the public officer to either do the act required to be performed or show cause before the court on a certain date why he has not done so. *Id.*  A peremptory writ directs the public official to perform the act without notice or an opportunity to be heard.  *See Bd. of Comm'rs of Guadalupe County v. Dist. Ct. of Fourth Judicial Dist.*, 29 N.M. 244, 256, 223 P. 516, 519 (1924).

The writ itself is required to set forth the full and complete allegations that entitle the petitioner to the writ.  *See City of Sunland Park v. N.M. Pub. Regulation Comm'n*, 2004-NMCA-024, ¶ 7, 135 N.M. 143, 85 P.3d 267 (stating that the writ becomes the initial pleading in the case that should state a cause of action within itself and that the allegations of fact in the petition itself are not considered).  Following service of the petition and alternative writ as directed by the court, the public official answers the factual allegations contained in the alternative writ and sets forth any legal defenses he has to the action. *See State ex. rel. Garcia v. Bd. of Comm'rs*, 21 N.M. 632, 641, 157 P. 656, 659 (1916) (holding that the answer to an alternative writ of mandamus may plead the facts, if any exist, which will defeat the writ, and set forth any legal reason why a peremptory writ should be denied).  Thus, the alternative writ serves the same function as a complaint in a civil action and the answer to the writ serves as the answer. *See City of Sunland Park*, 2004-NMCA-024, ¶ 7 ("Together, the writ and the answer form the issues that are before the court.").  After the answer is filed, the issues raised by these pleadings are then tried as in any other civil case. § 44-2-11 NMSA 1978 ("[T]he issues thereby joined [by the writ and answer] shall be tried and further proceedings had in the same manner as in a civil action.").

In this case, Horton filed a petition for a writ but prior to a writ being issued by the Court, the City and Curb North answered the allegations in the petition.  Consequently, the Court will consider the allegations set forth in the petition as if they were set forth in the writ.  *See City of*

performance of an affirmative act by another where the duty to perform the act is clearly enjoined by law and where there is no other plain, speedy and adequate remedy in the ordinary course of law." *West v. San Jon Bd. of Educ.*, 2003-NMCA-130, ¶ 9, 134 N.M. 498, 79 P.3d 842 (internal quotation marks and citation omitted); *see also State ex rel. Sandel v. N.M. Pub. Util. Comm'n*, 1999-NMSC-019, ¶ 11, 127 N.M. 272, 980 P.2d 55 (stating that "mandamus is an appropriate means to prohibit unlawful or unconstitutional official action.").  It is well established that mandamus will lie to compel the performance of mere ministerial acts or duties imposed by law upon a public officer to do a particular act or thing upon the existence of certain facts or conditions being shown, even though the officer is required to exercise judgment before acting.  *Id*. at 463, 292 P.2d at 331-32 (citing *State ex rel. Walker v. Hinkle*, 37 N.M. 444, 24 P.2d 286 (1933).  A ministerial act, as applied to a public officer, is an act or thing which he is required to perform by direction of law upon a given state of facts being shown to exist, regardless of his own opinion as to the propriety or impropriety of doing the act in the particular case.  *Id*. at 463, 292 P.2d at 332.

Under New Mexico law, an adequate remedy at law exists if the relief sought can be obtained in an administrative appeal.  *See State ex rel. Hyde Park Co., LLC v. Planning Com'n of City of Santa Fe*, 125 N.M. 832, 834, 965 P.2d 951 (Ct. App. 1998) ("Where an appeal process is available to a litigant, mandamus is not an appropriate vehicle for challenging an

---

*Sunland Park*, 2004-NMCA-024, ¶ 8 (stating that defects in the writ can be waived and the allegations in the petition may be considered where the respondent answers the allegations as if they were set forth in the writ); *State ex rel. Burg v. City of Albuquerque*, 31 N.M. 576, 581, 249 P. 242, 245 (1926) (holding that by answering the allegations set forth in the petition as if they were set forth in the writ, the defect in the writ was waived, and the allegations contained in the petition are deemed incorporated into the writ).

administrative decision.").

      To determine if a writ should issue, the Court must determine 1) if the City has a clear legal duty to hold a hearing on the first administrative appeal; 2) if the City has a clear legal duty to stay its decision pending a hearing on the first and second appeals; and 3) if Horton has a plain, speedy and adequate remedy in the ordinary course of law.

      As an initial matter, the parties dispute what appeal provision applies to the decision being challenged.  Horton argues that because the zoning ordinances and statutes give a municipality the authority to regulate the construction of buildings, including the issuance of building permits, the dispute regarding what impact fees apply when a building permit is issued is a zoning dispute that falls under the zoning appeals provisions at § 3-21-8(B) NMSA 1978 and City Code § 150.08.  The City, in contrast, argues that this dispute is one over impact fee assessment that has nothing to do with zoning, and, therefore, the appeals should be considered under the impact fees appeal provision at City Code § 150.33(B)(1).

      The City's position is supported by general statutory construction principles.  A fundamental premise of statutory construction is that a specific statute dealing with a subject controls over a general statute on the subject, unless it appears the legislature intended the general act to control. *Wetherill v. Bank IV Kansas, N.A.*, 145 F.3d 1187, 1193 (10th Cir. 1998); *see also Stinbrink v. Farmers Ins. Co.*, 111 N.M. 179, 182, 803 P.2d 664, 667 (1990) (When two statutes deal with the same subject, one general and one specific, the specific statute controls.).  The Zoning Act permits the City to regulate the "(1) height, number of stories and size of buildings and other structures; (2) percentage of a lot that may be occupied; (3) size of yards, courts and other open space; (4) density of population; and (5) location and use of building,

structures and land for trade, industry, residence or other purposes."  The Development Act permits cities to impose impact fees on new developments.  While both acts authorize the City to impose certain requirements prior to the issuance of a building permit, it is the Development Act that specifically authorizes the actions being challenged in this case and, therefore, is the controlling statute.

**B.**   **Did the City have a clear legal duty to stay its decision pending a hearing on Horton's first and second appeal?**

City Code § 150.33(B)(1) requires the posting of a bond to obtain building permits pending an appeal.[8]  Absent the provision of such a bond, the City did not have a clear legal duty to stay its determination pending Horton's appeals and Horton's petition for a writ of mandamus compelling the City to stay its decision regarding the amount of impact fees due on Horton's properties in the Cabezon Communities pending resolution of Horton's appeal must be denied.

Furthermore, Horton can obtain the relief sought here–the issuance of building permits pending the appeal–by posting a bond in accordance with City Code § 150.33(B).  *See State ex rel. Hyde Park Co., LLC*, 125 N.M at 834 ("Where an appeal process is available to a litigant, mandamus is not an appropriate vehicle for challenging an administrative decision.").  Thus, Horton's petition for a writ of mandamus to compel the City to stay its decision pending Horton's appeals also fails because Horton has a remedy in the ordinary course of law.

**C.  Did the City have a clear legal duty to hold a hearing on Horton's first appeal?**

––––––––––––––––––––

[8]  While the Development Act does not contain an appeals provision, the City has enacted an appeals provision for impact fees.  The City's impact fee appeal provision does not conflict with the Development Act because it neither permits an act the general law prohibits nor prohibits an act the general law permits.  *See City of Hobbs v. Biswell*, 81 N.M. 778, 781 (Ct. App. 1970) ("An ordinance may duplicate or complement statutory regulations.").

The impact fees ordinance appeal provision provides that "[a]n appeal from the provisions of this subchapter shall be submitted to the Impact Fees Administrator or his designees within 30 days from the event giving rise to the right to an appeal."  City Code § 150.33(B)(1).  The ordinance does not define the phrase "event giving rise to the right to an appeal."  The City's position is that Horton could not appeal the City's determination in the July 2, 2007 letter that the November 2005 Impact Fees Schedule applied to Horton's properties in the Cabezon Communities because 1) the letter was directed to Curb North and related only to the interpretation of the Development Agreement between Curb North and the City; and 2) at the time the letter was issued the City did not know whether Horton was in compliance with the City's interpretation of the Development Agreement.

While the July 2, 2007 letter was addressed only to Curb North, the letter specifically addresses the Development Agreement as applied to Horton's three tracts of properties in the Cabezon Communities and determines that the November 2005 Impact Fees Schedule applies to these properties.  Arguably, the fact that the letter makes a determination regarding Horton's properties is enough for the letter to constitute an "event" that could give rise to an appeal.  The fact that the duty to hold a hearing under these facts is disputable, however, makes a writ of mandamus inappropriate.[9]  *See Witt v. Hartman*, 82 N.M. 170, 172, 477 P.2d 608, 610 (1970)

---

[9]  In the cases in which a clear legal duty to perform has been found by the courts, the parties did not dispute the underlying facts giving rise to the public board's duty to perform. *See, e.g., Perea v. Baca*, 94 N.M. 624, 627, 614 P.2d 541, 544 (1980) (finding that because director of Department of Alcoholic Beverage Control had conceded that statutory requirements for issuing transfer of license had been satisfied, there was no question concerning the completion of the discretionary acts and mandamus was proper remedy to compel director's performance of duty to transfer license); *El Dorado at Santa Fe, Inc., v. Bd. of County Comm'rs*, 89 N.M. 313, 319, 551 P.2d 1360, 1366 (holding that Board of County Commissioners had clear duty to approve subdivision plat where Board admitted that it had determined that subdivision

(mandamus is appropriate to compel the performance of a statutory duty only when that duty is clear and indisputable).

Furthermore, following the filing of this motion, the City agreed to hear Horton's first appeal at the same time that it hears Horton's second appeal.  Consequently, Horton has a remedy in the ordinary course of the law and there is no need to resort to the extraordinary remedy of a writ of mandamus.

## II.    Temporary Restraining Order and Preliminary Injunction

In the alternative, Horton's motion seeks a temporary restraining order and a preliminary injunction.  With the consent of the parties, the Court proceeded directly to a preliminary injunction hearing with full briefing by the parties.

In its motion, Horton seeks 1) an injunction "prohibiting the City from violating Horton's constitutional rights and imposing unlawful exactions in connection with the City's building permitting process" and "maintaining the status quo that existed when the City issued" previous permits; 2) an injunction "prohibiting the City from acting on post-hoc, biased decisions regarding Horton's permits based on the City's litigation position;" 3) an injunction prohibiting Curb North from interfering with the City's permitting process in relationship to Horton. Parsing through the rhetoric, it appears that Horton seeks an injunction requiring the City to issue Horton building permits without Horton paying any additional impact fees until this litigation is resolved.

The main purpose of a preliminary injunction is simply to preserve the status quo

_____

application complied with statutory requirements).

pending the outcome of the case. *Penn v. San Juan Hospital, Inc.*, 528 F.2d 1181, 1185 (10th

Cir. 1975).[10]   In determining whether, in the interests of justice, a preliminary injunction should

issue, the Court must consider four factors:  (1) whether the moving party will suffer irreparable

injury unless the injunction issues; (2) whether the threatened injury to the moving party

outweighs whatever damage the proposed injunction may cause the opposing party; (3) whether

the injunction is adverse to the public interest; and (4) whether there is a substantial likelihood

that the moving party will eventually prevail on the merits.[11]  *Lundgrin v. Claytor*, 619 F.2d 61,

63 (10th Cir. 1980); *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 269 F.3d 1149,

1154 (10th Cir. 2001); *LaBablo v. Hymes*, 115 N.M. 314, 318 (Ct. App. 1993).  In general, "a

preliminary injunction is an extraordinary remedy; it is the exception rather than the rule." *GTE

Corp. v. Williams*, 731 F.2d 676, 678 (10th Cir. 1984).

### A.  Irreparable Injury

The moving party must show irreparable injury in order to obtain a preliminary

injunction. *Sampson v. Murray*, 415 U.S. 61, 88 (1974).  "A plaintiff suffers irreparable injury

when the court would be unable to grant an effective monetary remedy after a full trial because

such damages would be inadequate or difficult to ascertain."  *Dominion v. Echostar*, 269 F.3d at

---

[10]  In diversity cases, state substantive law generally governs the standards for
determining the merits of a requested injunction.  The standard for injunctive relief under New
Mexico law, however, is virtually identical to the standard applied in the Tenth Circuit so the
Court relies on cases from both jurisdictions in making its ruling.

[11]  If a preliminary injunction alters the *status quo*, a plaintiff must show that on balance,
the four preliminary injunction factors weigh heavily and compellingly in its favor.  *See SCFC
ILC, Inc. v. Visa USA, Inc.*, 936 F.2d 1096, 1099 (10th Cir.1991).  Altering the status quo
requires a court to grant mandatory relief under which the non-moving party must take
affirmative action, whereas prohibitory injunctive relief simply preserves the status quo.  *See id.*

1156.  Injury generally is not irreparable if compensatory relief would be adequate.  *Enterprise International, Inc. v. Corporacion Estatal Petrolera Ecuatoriana*, 762 F.2d 464, 472-73 (5th Cir. 1985).

Horton submitted several affidavits in support of its claim of irreparable harm.  In summary, these affidavits state that Horton priced and sold home in reliance on the impact fees set forth in Exhibit B to the Development Agreement; that if Horton cannot obtain additional building permits, it will lose future sales, will be unable to satisfy existing purchase agreements for homes, will lose employees, and its relationships with subcontractors will be damaged.  As a result, Horton alleges that its business reputation will be irreparably harmed.

Most of Horton's claimed injuries are compensable by monetary damages but, even assuming some of these alleged injuries could constitute irreparable harm,[12] Horton can avoid all the alleged harm by posting a bond in an amount equal to the disputed impact fee as provided by City Code § 150.33(B) pending resolution of his appeal.  The City has calculated this amount as $1,446,599.00.[13]  Horton disputes whether this amount is accurate but that is an issue the appeal process is intended to resolve.  If Horton prevails on its appeal that the amount is too high or should not have been assessed at all, the money will be returned.  Meanwhile, Horton will continue to receive building permits on its properties, eliminating any of the alleged irreparable harms identified by Horton.  *See, e.g., Cunningham v. Gross*, 102 N.M. 723, 726, 699 P.2d 1075,

---

[12]  *See Union Nat. Life Ins. Co. v. Tillman*, 143 F.Supp.2d 638 (N.D. Miss. 2000) (loss of a business' customers and damage to its goodwill are widely recognized as injuries incapable of ascertainment in monetary terms and may thus be irreparable, so as to support grant of preliminary injunction).

[13]  Horton does not contend that posting a bond in this amount would create a hardship.

1078 (1985) (In considering whether to grant an injunction, New Mexico courts generally consider a number of factors, including the relative adequacy to the plaintiff of an injunction when compared to other remedies); *Papaliolios v. Durning*,, 167 F.2d 737 (2nd Cir. 1948)(where relief requested in temporary injunction could be procured by payment of fine under protest and an action for the recovery thereof could be brought, temporary injunction was properly denied for lack of irreparable injury).

Horton also asserts that the violation of its constitutional rights are *per se* irreparable such that an injunction should issue.  While the cover page of Horton's motion requests that a preliminary injunction be issued enjoining the City from "violating Horton's constitutional rights and imposing unlawful exactions in connection with the City's building permitting process," Horton provides no argument in support of this requested relief and it is not clear what the basis for an injunction would be.  Furthermore, as discussed above, it is not clear that any due process violations have occurred, much less that there is any reasonable expectation a due process violation will occur in the future, particularly since the City is now holding a hearing on both appeals.

Horton has the ability to prevent any of its alleged irreparable harm by following the appeals process provided by the City.  Under these circumstances, the extraordinary injunctive remedy is not warranted.  Furthermore, requiring Horton to pursue its administrative remedies is consistent with the well-established body of law on exhaustion.  In ordinary situations, courts will defer exercising their jurisdiction over actions until available administrative procedures have been exhausted. *Schrank v. Bliss*, 412 F.Supp. 28 (M.D. Fla. 1976); 16 Wright & Miller, Federal Practice and Procedure § 3942 *et seq.* (1977).  In *Myers v. Bethlehem Shipbuilding Corporation*,

303 U.S. 41, 51, 58 S.Ct. 459, 464, 82 L.Ed. 638 (1938), the Supreme Court noted "the long-settled rule of judicial administration that no one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted." *Id.*  So long as there remain effective procedures for further consideration by the agency, judicial review is limited.[14]

Courts recognize three limited exceptions to the exhaustion rule. The first is when exhaustion of administrative remedies would be futile.  *See, e.g., Etelson v. Office of Personnel Management*, 684 F.2d 918, 925 (D.C. Cir. 1982) (exhaustion not required because agency firmly entrenched in its position and committed not to change).  The second exception is when the administrative remedies would be inadequate. *See, e.g., McCarthy v. Madigan*, 503 U.S. 140, 148-55, 112 S.Ct. 1081, 117 L.Ed.2d 291 (1992).  The third exception is when the plaintiff would suffer irreparable injury if forced to complete the administrative process. *See, e.g., McKart v. United States*, 395 U.S. 185, 197-201, 89 S.Ct. 1657, 23 L.Ed.2d 194 (1969).  While Horton argues that exhaustion of administrative appeals would be futile because the City has prejudged this matter, Horton has not provided sufficient evidence that the City is so entrenched in its position that an administrative appeal is futile.  In fact, the City, by granting a hearing on the first appeal after initially denying a hearing, is evidencing some flexibility in its positions.

**B.  Balance of Hardships**

As the party moving for an injunction, Horton bears the burden of demonstrating that "the threatened injury to the movant outweighs the injury to the other party under the

---

[14]  The exhaustion requirement generally does not apply to constitutional claims or when the question presented solely involves an issue of law.

preliminary injunction." *Kikumura v. Hurley*, 242 F.3d 950, 955 (10th Cir. 2001). From the

record, it does not appear that any party will suffer a hardship if an injunction does or does not

issue. Horton can obtain the relief it seeks–the continued issuance of building permits–without

an injunction by posting the necessary bond. An injunction requiring the City to issue building

permits without payment of additional impact fees will not cause any immediate hardship to the

City because impact fee payments are made to Curb North. While Curb North asserts that

Horton's failure to pay the disputed amounts may result in certain infrastructure not being built

in the long-term, this is an argument on the merits of the dispute. Curb North does not identify

any harm it will suffer if the City is required to issue building fees without payment of additional

impact fees during the pendency of this litigation.

The balance of hardships does not favor any party because no party has shown that it will

suffer grievous harm if it loses on the preliminary injunction motion.

### C.  Public Interest

Horton must also demonstrate that issuance of the preliminary injunction is not adverse

to the public interest. *City of Chanute v. Kansas Gas & Electric Co*., 754 F.2d 310, 312 (10th

Cir. 1985). Again, this element does not favor any party. It is important to remember that the

additional money allegedly due by Horton in impact fees is due to Curb North not to the City. It

is only when the Cabezon Communities are fully built, the City issues Curb North credits, and

those credits are used on another project that there could be any potential harm to the City and,

consequently, to the public interest.

There does not appear to be any public interest in the amount of money Curb North

collects from Horton under the Development Agreement in the short term such that temporarily

enjoining the collection of this money would cause any harm to the public interest.  While Curb

North contends that Horton's failure to pay the increase in impact fees may result in

infrastructure not being built at the Cabezon Communities, this potential shortfall will occur

years from now and will not be affected by an order prohibiting the collection of this money

during Horton's appeal.  Furthermore, it appears that Curb North is obligated under the

Development Agreement to build certain infrastructure regardless of the amount Horton pays in

impact fees.  Thus, the only way that infrastructure would not be built is if Curb North is

financially unable to construct it.

The City also argues that if the Court issues an injunction permitting Horton to obtain

building permits without paying full impact fees, Horton will have an unfair business advantage

and every other homebuilder in the Cabezon Communities will demand equal treatment.  This

argument, while perhaps true if Horton ultimately prevails in the litigation, is not relevant to the

issuance of a short-term injunction.  A short-term injunction preventing the City from collecting

additional impact fees from Horton pending resolution of this litigation would not give a

financial advantage to Horton because the Court would require the posting of sufficient security

to cover the payment of potential costs and damages.  *See* Fed. R. Civ. P. 65(c) ("No restraining

order or preliminary injunction shall issue except upon the giving of security by the applicant, in

such sum as the court deems proper, for the payment of such costs and damages as may be

incurred or suffered by any party who is found to have been wrongfully enjoined or restrained.").

### D.  Success on the Merits

The fourth prerequisite for obtaining a preliminary injunction is a showing of a likelihood

of success on the merits.  In *Otero Savings & Loan Association v. Federal Reserve Bank*, 665

F.2d 275 (10th Cir. 1981), the Tenth Circuit adopted the Second Circuit's liberal definition of the "probability of success" requirement. When the other three requirements for a preliminary injunction are satisfied, "it will ordinarily be enough that the plaintiff has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberate investigation." *Id*. at 278. In this case, the first three factors are not meet so the modified test does not apply. Consequently, Horton must "establish a reasonable probability of success" in order for a preliminary injunction to issue. *Atchison, Topeka, and Santa Fe Railway Co. v. Lennen*, 640 F.2d 255, 261 (10th Cir. 1981).

While the issues raised in this case are complex, and the Court is not fully cognizant of the intricacies of the parties' respective positions, the arguments presented at the hearing on this motion as well as the evidence submitted with the briefing establish that all parties, including Horton, have made substantial arguments in favor of their respective positions. Consequently, the Court finds that Horton has established a reasonable probability of success.

In sum, Horton established that an injunction is not against the public's interest and that Horton has a reasonable probability of success. Horton has not established, however, that it will suffer any irreparable injury or that the balance of hardships favors an injunction. Under these circumstances, the extraordinary remedy of a preliminary injunction is not warranted.

## CONCLUSION

**IT IS THEREFORE ORDERED** that Plaintiff's Petition and Motion for Writ of

Mandamus and/or Temporary Restraining Order and Preliminary Injunction, filed September 21,

2007, **[Doc. No. 23]**, is **DENIED**.

Dated this 25th day of October, 2007.

_____
MARTHA VÁZQUEZ
CHIEF U. S. DISTRICT COURT JUDGE

Attorneys for Plaintiff:
    Stephanie Landry
    Margaret C. Ludewig

Attorney for Defendant Curb North, Inc.:
    Richard Leverick

Attorney for Defendant City of Rio Rancho:
    Randy S. Bartell